# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| enXco Development Corporation, | Case No. _____ (____/____) |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Northern States Power Company, | |
| Defendant. | |

Plaintiff enXco Development Corporation ("enXco"), for its Complaint against Defendant Northern States Power Company ("NSP"), states and alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.  enXco is a corporation organized and existing under the laws of the State of Delaware. enXco maintains its principal place of business at 15445 Innovation Drive, San Diego, CA 92128.

2.  NSP is a corporation organized and existing under the laws of the State of Minnesota. NSP maintains its principal place of business at 414 Nicollet Mall, Minneapolis, MN 55401.

3.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between enXco and NSP. The amount in controversy exceeds $75,000, exclusive of interest and costs.

4.  Venue is proper in this district under 28 U.S.C. § 1391(a) because NSP resides in this district, because NSP is subject to personal jurisdiction in this district and because the agreements that are the subject of this action were negotiated in this district.

In those agreements, enXco and NSP agreed to submit to the jurisdiction of the federal or state courts located in Hennepin County, Minnesota.

## FACTS COMMON TO ALL COUNTS

**A.     Parties and Agreements**

5.     enXco designs, constructs, develops and operates renewable energy projects, including solar and wind energy projects.

6.     NSP is an electric and natural gas utility company and a subsidiary of Xcel Energy, Inc. ("Xcel Energy"), an investor owned utility traded on the New York Stock Exchange.

7.     enXco developed certain property located in Dickey County and McIntosh County, North Dakota, for the purpose of constructing a wind-energy generation project capable of supporting the installation and operation of one hundred 1.5 megawatt nameplate rated wind turbine generators (the "Merricourt Project").

8.     On October 24, 2008, enXco and NSP entered into the Developed Wind Project Purchase and Sale Agreement for the Merricourt Project (as amended, the "PSA") under which enXco agreed to sell, and NSP agreed to purchase, enXco's wind energy development assets ("Purchased Assets"), including real property assets, for $15,000,000.

9.     Contemporaneous with the PSA, the parties entered into a separate Engineering, Procurement and Construction Agreement for the Merricourt Project which was subsequently amended and restated on March 26, 2009 (as amended, the "EPC Agreement") under which NSP agreed to pay enXco $353,500,000 for engineering, procurement of necessary infrastructure (including one hundred 1.5 megawatt nameplate

rated wind turbine generators), construction, commissioning, start-up and testing of the Merricourt Project. As a result of change orders, the price under the EPC Agreement was increased to $365,472,320.

10. Shortly after the parties executed the agreements for the Merricourt Project, the United States experienced an economic crisis followed by a protracted recession.

11. One consequence of the recession was to lower demand for electricity in the United States. Lower demand and other effects of the recession caused investor-owned utilities, like Xcel Energy, to reconsider their commitments to wind projects then under contract and, in several cases, to terminate wind energy projects similar to the Merricourt Project. By the beginning of 2010, upon information and belief, NSP determined that it would be financially advantageous to Xcel Energy and its shareholders to terminate the PSA and the other agreements related to the Merricourt Project.

B.     enXco's Work on Environmental Issues

12. As part of its development of the Merricourt Project, enXco contracted with Kadrmas, Lee and Jackson ("KLJ")—an engineering and environmental consulting firm—to assist in coordinating appropriate environmental assessments.

13. On June 17, 2009, KLJ contacted the United States Fish and Wildlife Service ("FWS") to request environmental information related to the development of the Merricourt Project.

14. FWS provided comments regarding the Merricourt Project in a letter dated July 8, 2009. The bulk of FWS's comments proposed measures that could be taken to mitigate the project's impact on migratory birds, including marking overhead power

lines, avoiding construction during breeding seasons and maintaining adequate buffers. FWS identified two species—the whooping crane and the piping plover—as two avian species that could potentially be affected by the Merricourt Project.

15. In its July 8, 2009 letter, FWS did not make any specific recommendations regarding whooping cranes. FWS did recommend avoidance of construction activities within one-half mile of the critical habitat of the piping plover.

16. enXco followed substantially all recommendations provided by FWS in its July 8, 2009 letter in proceeding with the design, development, and construction planning for the Merricourt Project. As requested by FWS, enXco maintained contact with FWS regarding its plans for development of the site.

17. On February 5, 2010, FWS provided specific recommendations to enXco regarding measures to reduce the impact of the Merricourt Project on whooping cranes. After stating that the "risk of lethal take to whooping cranes from wind turbines is not known at this time," FWS proposed use of underground power lines, where feasible, and installation of visual marking devices for overhead lines.

18. FWS's February 5, 2010 letter further recommended that enXco "identify and map all wetlands at the project site within ½ mile of all turbines" and "analyze the potential effects to migrating whooping cranes."

19. Notwithstanding FWS's acknowledgment that the risk of lethal take to whooping cranes was unknown, FWS's February 5, 2010, letter asserted that, "With the available information, the Service believes that an adverse effect to whooping cranes is likely. Therefore,

the Service recommends that [enXco] not commence project construction until they [*sic*] have applied for and receive[d] an Incidental Take Permit, if needed . . ."

20. The potential for development projects to have an adverse impact on endangered or threatened birds is not unique to the Merricourt Project and is an issue that affects regional and national development projects in general and wind energy projects specifically. As a consequence, communications such as FWS's February 5, 2010 letter are not uncommon. The issues raised in such letters are typically resolved through discussion and negotiation and, in many instances, issuance of an Incidental Take Permit ("ITP") pursuant to Section 10(a)(1)(B) of the Endangered Species Act of 1973 (as amended, the "ESA"), and generally provide no impediment to the construction and operation of wind energy projects.

21. Nonetheless, on May 10, 2010, more than ten months before the scheduled "Long-Stop Date" (as defined in the PSA) to close NSP's purchase under the PSA, NSP seized upon FWS's February 5, 2010 letter as an excuse to notify enXco of alleged breaches of representations and warranties contained in the PSA. In addition, at the same time, NSP purported to provide notice of a "Material Adverse Effect" ("MAE") under the PSA based on "the circumstances which have resulted in the aforementioned breach by [enXco]."

22. Specifically, NSP asserted breaches of representations and warranties contained in Sections 6.6, 6.7 and 6.11 of the PSA. The first two provisions, Sections 6.6 and 6.7, generally relate to compliance with laws and environmental regulations. Section 6.11 relates to Merricourt Project-related permits set forth in a separate Schedule 6.11 to

the PSA, including "Seller Permits," which are defined as those permits that enXco was to obtain, hold and assign to NSP on the "Project Closing Date" (as defined in the PSA). An ITP is not listed among the permits identified as a Seller Permit on Schedule 6.11.

23.     Moreover, an ITP is not required for construction or operation of the Merricourt Project, but is merely "insurance" to protect against the highly unlikely event of prosecution should there be an incidental "take" of an endangered or threatened species.

24.     A MAE is defined in the PSA, in relevant part, as "any effect (or effects taken together) that is materially adverse to the present or future business, operations, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Project or the Property . . . other than any effect resulting from either changes in the international, national or regional electric industry in general . . . and that does not have a disproportionate impact on the Project, as compared to similar wind energy development projects in the U.S."

25.     enXco responded to NSP's notice by advising NSP that an ITP is not a Seller Permit for the Merricourt Project, that NSP's contention of alleged breaches of the PSA were premature and that there had not, in fact, been any breach or MAE.

26.     Meanwhile, enXco continued to work to satisfy all conditions necessary to close under the PSA.  In addition, though not obligated to do so, enXco continued to work with FWS to address the whooping crane issue.  Specifically, enXco's consultant KLJ continued its research and prepared an environmental-effects study that proposed measures to protect the habitat of whooping cranes and their migratory patterns.  Through

these efforts, and as expected in the normal course, FWS determined that the Merricourt Project is "unlikely to rise to the level of a take" with respect to the whooping crane.

27. In November/December 2010, FWS for the first time recommended that enXco obtain a separate project-specific ITP based on FWS's "belie[f] that take of piping plovers due to turbine strikes is likely at some point in the life of the project . . ." Again, the issues raised by FWS are not uncommon and did not present a threat to the construction and operation of the Merricourt Project or present a material financial risk to NSP, Xcel Energy or NSP's ratepayers.

28. Nonetheless, on March 4, 2011, as enXco was in the process of resolving the piping plover issue with FWS, NSP, again looking for a reason to terminate the PSA, asserted that FWS's letter suggesting that enXco obtain an ITP for the piping plover constituted a MAE.

29. On March 31, 2011, FWS issued a letter formally confirming that enXco's proposed habitat conservation efforts would compensate for any adverse effect on the whooping crane and was "unlikely to rise to the level of take." FWS further indicated that enXco's proposed development plan avoided the critical habitat of the piping plover and that additional measures proposed by enXco pending issuance of an ITP, including some voluntary curtailment during periods, if any, that piping plovers are present in the area, would "reduce the likelihood of lethal take of piping plovers" due to turbine strikes. At same time, FWS acknowledged that it had no evidence that plovers that might be in the area are susceptible to turbine strikes, but stated that its obligation is to "err on side of the species."

**C.     Termination**

30.     The Long-Stop Date for closing the PSA was March 31, 2011.

31.     On April 1, 2011, despite the FWS March 31, 2011, letter, NSP purported to terminate the PSA, alleging that the potential take of whooping cranes and piping plovers constituted a MAE under the PSA.  NSP further alleged that the possibility of limited voluntary curtailment related to piping plovers pending issuance of an ITP, though not mandated by FWS and uncertain to occur, constituted a MAE.  NSP reiterated its position that enXco allegedly breached Sections 6.6, 6.7 and 6.11 of the PSA.  In addition, NSP asserted that a delay by the State of North Dakota Public Services Commission ("PSC") in issuing a Certificate of Site Compatibility constituted a breach of Section 6.11 of the PSA, notwithstanding the fact that the permit will issue and the delay was solely due to a cancellation of a required public hearing first because of inclement weather and then a mistake by the PSC with respect to the statutorily-required location for the hearing.

32.     Concurrent with its purported termination of the PSA, NSP also purported to terminate the EPC Agreement, claiming a right to do so pursuant to EPC Agreement Section 13.8.

33.     Subsequent to its purported termination of the PSA and the EPC Agreement, NSP has unequivocally and unambiguously stated that it deems the PSA and EPC Agreement to be cancelled and that it has no further obligations to perform under either contract.

34. enXco has complied with all conditions and obligations under the PSA and the EPC Agreement.

## CLAIMS FOR RELIEF

## COUNT I: DECLARATORY JUDGMENT (28 U.S.C. § 2201)

enXco repeats and realleges all of the foregoing paragraphs of this Complaint and further states:

35. The PSC has rescheduled the hearing with respect to the Certificate of Site Compatibility to May 12, 2011.

36. An actual case or controversy exists between enXco and NSP with respect to whether, by reason of delays not within its control, enXco was excused from securing the Certificate of Site Compatibility by the Long-Stop Date of March 31, 2011.

37. An actual case or controversy exists between enXco and NSP with respect to whether an ITP is a permit that enXco was required to obtain, hold and assign as of the Long-Stop Date.

38. An actual case or controversy exists between enXco and NSP as to whether there has been a MAE.

39. enXco is entitled to pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201, et. seq., to a declaratory judgment declaring and adjudicating (a) that it was excused from securing the Certificate of Site Compatibility by the Long-Stop Date; (b) that an ITP is not a permit that it was required to obtain, hold, and assign as of the Long-Stop Date; (c) that there has been no MAE; and (d) that NSP had no right to terminate the PSA or the EPC Agreement.

## COUNT II: BREACH OF CONTRACT (SPECIFIC PERFORMANCE-PSA)

enXco repeats and realleges all of the foregoing paragraphs of this Complaint and further states:

40. The Purchased Assets that enXco is to convey to NSP under the PSA are unique and include interests in real property.

41. As a result of the unique nature of the Purchased Assets to be conveyed under the PSA, Section 9.3.4 of the PSA allows either party to "enforce the provisions of this Agreement by injunction, specific performance or other equitable relief."

42. As of the Long-Stop Date, enXco was willing and able to convey all of the Purchased Assets it held and could assign all Seller Permits, other than the Certificate of Site Compatibility.

43. Pursuant to PSA Section 8.3, NSP is required to use reasonable efforts to assist enXco in securing the Certificate of Site Compatibility and any authorizations necessary for the transfer of that certificate to NSP.

44. On issuance of the Certificate of Site Compatibility, enXco will have secured all Seller Permits that it is required to obtain, hold and assign under the PSA.

45. On issuance of the Certificate of Site Compatibility, by the express terms of the PSA, enXco will be entitled to an order and judgment compelling NSP to specifically perform its obligations under the PSA, to assist in securing the transfer of the Certificate of Site Compatibility, to close on the PSA, and to rescind the termination of the EPC Agreement.

## COUNT III:  BREACH OF CONTRACT (PSA AND EPC)

enXco repeats and realleges all the foregoing paragraphs of this Complaint and further states and alleges as follows:

46. NSP's purported April 1, 2011, termination of the PSA and EPC Agreement was wrongful and in breach of NSP's obligations under the PSA and EPC Agreement.

47. NSP's subsequent unequivocal and unambiguous statements that it deems the PSA and EPC Agreement to be cancelled, and that it has no further obligations to perform under either contract, is a repudiation and breach of its obligations under the PSA and EPC Agreement.

48. As a direct and proximate result of NSP's breach and repudiation of the PSA and EPC Agreement, enXco has been and will be damaged in the amount of $15,000,000 with respect to the PSA, and an amount not less than $230,000,000 with respect to the EPC Agreement.

## PRAYER FOR RELIEF

WHEREFORE, enXco prays that the Court enter judgment in its favor and against NSP as follows:

1. Declaring and adjudicating (a) that was excused from securing the Certificate of Site Compatibility by the Long-Stop Date; (b) that an ITP is not a permit that it was required to obtain, hold and assign as of the Long-Stop Date; (c) that there has

been no MAE; and (d) that NSP had no right to terminate the PSA or the EPC Agreement.

2. Compelling NSP to specifically perform its obligations under the PSA and to rescind its termination of the EPC.

3. As an alternative to specific performance, awarding enXco damages against NSP of $15 million for breach of the PSA and not less than $230 million for breach of the EPC Agreement.

4. In addition to each of the alternative forms of relief set forth above, for prejudgment interest, its costs and such further relief as is just and equitable.

STOEL RIVES LLP

Dated: May 4, 2011

s/ Marc A. Al
Jonathan C. Miesen (19752X)
Marc A. Al (247923)
John J. Brogan (342026)
33 South Sixth Street, Suite 4200
Minneapolis, MN  55402
Telephone: 612-373-8800
Facsimile: 612-373-8881
jcmiesen@stoel.com
maal@stoel.com
jjbrogan@stoel.com

Joel A. Mullin (OSB 862533) (of counsel)
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: 503-294-9665
Facsimile:  503-220-2480
jamullin@stoel.com

**ATTORNEYS FOR PLAINTIFF**